# SUPREME JUDICIAL COURT

FOR THE

COUNTY OF SUFFOLK, NOVEMBER TERM 1853, AT
BOSTON.

PRESENT.

HON. LEMUEL SHAW, CHIEF JUSTICE.
HON. CHARLES A. DEWEY,
HON. THERON METCALF,
HON. GEORGE T. BIGELOW, }JUSTICES.
HON. PLINY MERRICK,

JOY H. FAIRCHILD vs. NEHEMIAH ADAMS.

In this commonwealth an award, made in pursuance of a reference under a rule of court, will not be set aside for alleged mistakes of law on the part of the referees, unless they have themselves been misled, or unless they refer questions of law to the court.

THE facts in this case are sufficiently stated in the opinion of the court, which was delivered at November term, 1852, by SHAW, C. J. This case arises upon a motion to accept an award made by referees appointed under a rule of court. The action was slander, and it was referred to three gentlemen,

Fairchild *v.* Adams.

lawyers, belonging to three different counties other than Suffolk. The plaintiff seeks to set aside their award upon several grounds, specifically enumerated, in which he alleges the report to be erroneous in matters of law and matters of fact.

The great question arising here is of the nature and conclusiveness of awards, made in pursuance of references entered into under rules of court. There are several decisions upon such awards, as well as upon awards made by referees appointed in pursuance of the statute, by agreements entered into before justices of the peace, to which I shall have occasion to refer. The award before us is contained in a detailed report, which I shall refer to more particularly hereafter.

The tendency of modern jurisprudence is, to give force, conclusiveness, and effect to all awards, where there is no corruption or misconduct on the part of the referees, and where no deception has been practised upon them. Parties have a right, if they please, to refer all questions between them to arbitration ; *volunti non fit injuria.* It has long since been settled, that awards are conclusive on all matters of fact submitted to arbitrators. A reference has been recognized as a step from a court of justice, and as intended to supersede a resort to the court. Formerly, but within the recollection of several of us, it was the practice, in cases of controverted awards, to call before the court one or more of the referees, and inquire of them as to the grounds of their award, as well in matters of law as of fact. This practice has long been set aside. Still, in matters of law, it is considered that the court has a larger jurisdiction, though where the reference has been made to lawyers, it has been deemed to include a more entire submission to their opinion upon such matters of law as may have been involved. But what does this mean ? Simply that it is supposed to be intended by the parties that the case shall be decided according to law. And do they not intend this in all cases ? The rule refers contested questions of right to the decision of the arbitrators, and what are any questions of right but questions of fact first, and then of the rules of law applicable to the facts ? To

decide such questions of right, it is necessary to ascertain the facts in the first instance, and then to apply to them the rules of law, and in many great cases it has appeared that what at first seemed to be new and difficult questions of law, were merely complicated questions of fact. The rule is very simple and well understood, that the promise in a note of hand made upon good consideration, is valid and binding, and yet it is often as difficult to settle questions arising upon promissory notes as any other, as questions of usury, for example, or of the consideration moving between the parties, or of payment in part or in full.

Taking this question upon the authorities, there are many worth looking at. In the case of *Kleine* v. *Catara*, 2 Gallison, 61, before *Story*, J. it was held, that where the parties refer a question of law to arbitrators, their decision thereon is conclusive. Judge *Story* perhaps goes further than the courts of this state have gone, in holding that referees may decide according to the rules of equity and good conscience, and against the strict law, provided they admit the law and show their intention clearly to decide against it; though if they merely state their reasons for their decision, in such a manner as to refer the questions of law therein to the court, then the court has the same control over their award as over a decision brought before it on error. In the state courts, it has been a very regular course for many years to hold that where no error or mistake appears upon the face of the award, the decision of the referees is conclusive in law. The case of *Jones* v. *The Boston Mill Corporation*, 6 Pick. 148, is often cited. The question there was between riparian owners, and related to their respective rights to certain real estate, which had once been covered with water. I think there was a board of arbitrators appointed by a simple agreement of the parties under seal. My recollection in that particular is not distinct, though I was myself on the arbitration. It was held there by the court, that where the parties intended to leave the whole matter in dispute to the arbitrators, and the latter settled the lines, and stated no reasons for the decision at which they had arrived, that decision was conclusive, even if they had mis-

taken the law. *Bigelow* v. *Newell*, 10 Pick. 348, is a very instructive case, and one which is frequently referred to There the plaintiffs had brought an action against the owner of mills situated at a lower point on the same river with mills owned by themselves, to recover damages for injury to their ancient mills, by the raising of the defendant's dam to such a height that the back water therefrom injuriously affected the operation of the mills of the plaintiffs. A second ground of action in the same case was, that such elevation of the defendant's dam was ruinous to another mill-site of the plaintiffs, situated at a short distance below their ancient mills, and on which they had begun to erect a new mill, when they were prevented by the above-mentioned proceeding of the defendant. The parties, on the return of the writ, agreed to refer the action and all matters in dispute between them, to the determination of Samuel P. P. Fay, William Baylies, and James F. Baldwin, Esquires, two lawyers and an engineer. After a hearing, the referees reported that the defendant's dam should be cut down, and this report was subsequently recommitted to them, on motion of the defendant, that they might reconsider the case, and report their decision upon such questions of law as either party should request to have reported, and so much of the evidence as should present those questions fairly. They made a second report confirming the former, and setting out the grounds of their award. To this, several exceptions were taken, and it was contended that the referees had made several mistakes in matters of law. One of the chief grounds of exception was, that under the statute, the owner of a mill has a right to overflow lands bordering on the river on which it stands, subject to the duty of paying damages therefor, and that such overflow constitutes no nuisance, and consequently, that though the referees could direct the payment of damages by the defendant, they could not direct the cutting down of any part of his dam. And it was urged that the phrase " always having regard to the *legal rights* of the parties," which had been used in the submission, gave peculiar force to this exception, and, indeed, required the referees to decide in absolute conformity to the rules of law.

Fairchild *v.* Adams.

But the court decided that the award was conclusive; partly, doubtless, upon the ground that the parties had themselves chosen the referees, who were very competent persons, and had agreed to abide by their determination, though the court also say that they find no error in point of law in the decision. The ultimate reason for maintaining any award is, indeed, that the parties have selected their own arbitrators and agreed to refer certain things to their determination, as their attorneys. And it is idle to say that they have a right to do that, and that, when they have done it, the decision of the arbitrators fairly made is not final.

And what is the distinction between making referees judges of law and judges of fact, in regard to the matters submitted to them? A decision of a court of competent jurisdiction, is merely a statement that such is the law of the land, and the presumption is, that where the law has once been so declared it will be again. That is the foundation of our system of precedents. But the parties have as good a right to say, that they will choose their own judges in their own case, as to resort to the regular tribunals, and it is presumed they will choose persons of competent capacity and sufficient legal skill. The conclusions of the arbitrators upon questions of law or of fact must stand upon the same grounds. These classes of questions are conveniently separated in another class of cases, wherein the law is decided by the court and the facts by the jury; but the matter submitted to referees is simply what is right between the parties in the particular case. In the matter of authority, *Bigelow* v. *Newell* is decidedly in point.

In the case of the *Boston Water Power Co.* v. *Gray,* 6 Met. 131, there was a great and important controversy submitted by the parties to a very competent board of referees. The questions were of water-power and hydraulics, as well as law, and the referees consisted of one engineer and two lawyers.—One of the latter, I believe, was both an engineer and a lawyer. Their award set forth to some extent the principles and grounds of the conclusion at which they had arrived, and to

some of these, exceptions were taken. The action was covenant. The court ruled upon the exceptions, that if the referees had not been misled or deceived, their decision was conclusive. To this ruling of the court, exceptions were also taken, and the whole court, in deciding thereon, held that if there had been unfair conduct on the part of the referees, if any wrong had been done to the party objecting, as, by not giving him a fair hearing, or by illegally hearing the other side *ex parte*, their action was open to proof before the court. Here no such thing is stated.

Another exception is, where the arbitrators are deceived by one of the parties, to the injury of the other ; as, for instance, where engineers, in making surveys, are led to suppose the area of a piece of ground greater than it is, by having a chain furnished them with a link taken out. The consequence of such a deception would be, that the report of the engineers would not give the result of their skill, and would be a mere mistake throughout. But, at the same time, if engineers, acting as arbitrators, apply instruments or rules which other engineers think wrong, but which they themselves believe to be correct, if their judgment has been honestly used—the judgment resorted to by the parties—their conclusion is final. So if the conclusion is honestly drawn by them from the facts before them, though the facts may not fairly warrant such conclusion.

Another exception is, where there is raised on the face of the report itself a question of law, which is submitted by the referees to the judgment of the court. There, there is no award but in the alternative. In that respect the award is precisely like a special verdict, and is so treated by the court. Such was the case of *Wilby* v. *Phinney*, 15 Mass. 116, where a suit brought by a surviving partner against the administrator of his deceased partner was submitted to referees, who found the facts, but submitted to the court several questions, whether, upon such facts, the plaintiff was entitled to recover. The court held that he was so entitled, and judgment was entered on the award accordingly. In this case, the award

reserved certain questions of law, which being decided, the award would become absolute. If, however, it is manifest that the referees do not intend to submit the question of law to the court, but merely state the question for the satisfaction of the parties, such a statement does not authorize the court to disturb the award. It was so held in the case of *Ward* v. *The American Bank*, 7 Met. 486, which was decided not long after the case of the *Boston Water Power Co.* v. *Gray.* In that case the parties, under a rule of court, submitted cross-actions arising out of a complicated state of facts to a referee, who made his award thereon. One of the parties subsequently applied to him for a statement of the grounds of his decision, whereupon he made and returned to the court a certificate of the facts, and of his conclusions in regard to them, but with the statement that he did not intend to submit the matters arbitrated to the decision of the court. The court held that this paper was inadmissible as the ground for a revision of the award.

But it is argued, and this is the only possible ground on which the claim for a revision of the award can be maintained, —that if the arbitrators state the grounds of their award simply and without expressing the contrary, it is to be presumed that they do mean to submit those grounds to the court. This is to be taken with some qualification. If they state the grounds of their decision avowedly for the satisfaction of the parties, or one of them, and it distinctly appears that they do not intend to submit their conclusions as matter of law to the court, then the award is conclusive. The question is, as to the intent of the arbitrators. Perhaps where they say nothing in regard to their intent, the presumption is that they intend to say " these are the grounds of our award, if they are right in point of law, we think the award is right, but we submit the question to the court." In such a case the court might revise and set aside the award, if it were found not to be well grounded in point of law, because it would not then be the award which the arbitrators intended to make.

In the case before us, the great point is whether the arbitrators intended to submit any question of law to the court,

and if they did, whether they are mistaken in regard to such question. We use the printed report of the award.*

The action was brought for written and oral slander, uttered by the defendant in a vote of expulsion of the plaintiff, proposed at an association of ministers to which both belonged, in the republication of that vote, with the alleged reasons for it, and in certain oral charges of crime and misconduct. The vote of expulsion, and the alleged reasons for its adoption, were passed and uttered more than two years before action brought, and were therefore barred by the statute of limitations, but it is alleged that there has been a republication of them by the defendant within two years prior to the date of the writ. On the 2d of June, 1842, the plaintiff, at his own request, was dismissed from the charge of a society at South Boston, and in September, 1843, he was installed as pastor of a church at Exeter, New Hampshire. While resident at South Boston, he had become a member of a certain society called the Suffolk South Association of Ministers, and continued his membership after his removal. The defendant was also a member of the same association. In June, 1844, a committee of the association, of whom the defendant was one, were appointed, at the plaintiff's request, to investigate certain charges against him, contained in an anonymous pamphlet, and they found these charges untrue, but at the same time they made a written communication to the association, stating that certain documents had been placed in their hands, charging the plaintiff with a flagrant crime, and they advised an examination of those charges. The defendant informed the plaintiff of these charges, and the plaintiff proposed to refer the examination of them to the association, but, at the defendant's suggestion, concluded to refer the subject to an ecclesiastical council to be called at Exeter. This council reported unfavorably to the plaintiff. Proceedings were subsequently had by the association at South Boston, in which the defendant participated, in relation to these charges against

---

* A copy of this report may be found in the "Monthly Law Reporter," of September, 1851, page 278, but it is unnecessary to recite it here.

the plaintiff, running through several years, and up to the 3d of July, 1849, and the votes passed with the defendant's concurrence, and remarks made by the defendant in the course of such proceedings, embrace the cause of action against him. Whatever took place more than two years' before action brought, was only admitted in evidence, as tending to show malice on the part of the defendant. There are other material facts stated in the award, which, however, need not here be referred to.

The plaintiff alleges that a certain vote passed in 1845 by the association, was a libel; that its remaining on record, and especially its being read in the hearing of two clergymen casually present, but not members of the association, and a vote of the association in July, 1849, containing a reference to the former vote, reciting that it was incorrect in terms, and slightly altering its terms, but refusing to rescind it; that these were republications within two years' prior to the date of the writ; that the defendant having voted for these proceedings, and exerted his influence in their favor, is responsible for them, and that no defence will avail him short of proving their truth. The defence is that the statements and votes in question were privileged communications; that the parties were members of a ministerial religious association, for purposes of general and mutual improvement and profit; that the investigations, which resulted in the votes and statements complained of, were commenced upon the special request of the plaintiff, and that no more was done by the association than was necessary to carry out to their proper conclusion, the proceedings so commenced. It appears that the plaintiff had not only requested them to investigate the charges, but also, in July, 1849, requested to be dismissed from their association, and recommended to a similar one, called the Woburn association. They did not pretend to exercise any jurisdiction in the premises, except so far as it was invited or submitted to, by the plaintiff.

Now what is a privileged communication? There are many cases in the books relating to this subject, but most of them present questions compounded of law and facts. It is

47 *

clear that a party may be privileged to make communications, to the disadvantage of another, upon proper occasions, even though he may be mistaken in regard to the facts communicated. The question is, as to what is a proper occasion. When this is settled, the law is plain. The submission of the plaintiff to the jurisdiction of the association, the extent of such submission, and the action of the association thereon, were all facts on which the referees were to decide. What was the object of the plaintiff in making the submission? It was in the first place, that he might be in fair standing with the association itself, and, secondly, he having removed to a foreign state, he desired them to recommend him to another and similar association. The referees were bound first to exercise due diligence to find the facts, and then to exercise their judgment in deciding upon the relative rights of the parties, growing out of those facts. If they could exercise their judgment in one way, they could do it also in another. In the year 1849, the facts took place, which gave rise to the plaintiff's action. The decision of the council at Exeter, was reported to the association by their committee, and subsequently, in January, 1845, the preamble and vote complained of were passed. Before the meeting of the council, however, the plaintiff was indicted in the municipal court for the crime of adultery, with one Rhoda Davidson. Upon the trial of this indictment, he was acquitted. In July, 1845, a new church was organized at South Boston, and the plaintiff was installed as its pastor. In May, 1849, he requested the association to furnish him with a copy of the preamble and vote in question, and his request was complied with. He then, in a printed circular, addressed to the members of the association, requested them to revise their proceedings, and rescind the vote, on the ground that its alleged causes were false and libellous; and, in a written postscript, addressed to on of the members, requested that notice might be given him, if his request were refused, or any action against him were proposed. He also requested Mr. Kirk, a member of the association, to obtain certain evidence, and inform himself satisfactorily respecting a certain disease mentioned in the writ, and to use his influ-

ence to procure the rescission of the vote. The information was accordingly obtained and laid before the association. The application was presented at their meeting July 3d, 1849. They adjourned to the 10th of July, when the plaintiff appeared and addressed them on the subject, and also requested to be dismissed from their body, and recommended to the Woburn association.

The defendant was present at this meeting, and when the vote was taken, was called on in his turn, to give his vote and state his reasons for it. In giving his reasons, he read portions of a deposition which had been laid before the association, and argued that it contained proof that the plaintiff had been affected with the disease alluded to. His remarks at that time are the oral slander charged. The association declined to rescind the vote of January, 1845, but passed a preamble and vote, adopting the result of the Exeter council, and concluding that the plaintiff for the matter charged on him at that council, and for his persistent denial thereof, should be separated from his connection with the association. The report recites in full the proceedings at this meeting. All this took place in the presence of the plaintiff, and while the requests urged by him were under discussion. The defendant was called on for his vote on the subject of those requests and for his reasons, and he gave them. The general tenor of the case is, that there was a specific request by the plaintiff that a certain vote might be rescinded, that he was heard on the subject, that a final vote was taken, and that the defendant gave the reasons on which his own vote was grounded.

Now were these reasons privileged communications ? This depends on the questions whether the defendant was actuated by malice, and if not, whether he was authorized to make such communications at that time and place, and whether he exceeded or not the proper bounds of privileged communications in what he said. Now these were questions of fact, proper for the referees to inquire into, and it appears that they did inquire, and decide concerning them. The report then states the ground assumed by the plaintiff, that the vote of the 7th of January, 1845, was a libel; that its remaining on

record, and especially its being read in the presence of two clergymen, casually present and not members of the association, and the vote not to rescind it, were republications within two years; that the defendant having voted for these proceedings, and exerted his influence in their favor, is responsible for them, and that no defence will avail him, but proving the truth of the allegations. To this the defendant answers that clerical associations are by law privileged to institute inquiries into the conduct of their members, to pass votes of expulsion against them, and to record their proceedings, provided it be done in good faith and without malice, and that he is not bound to prove the truth of the allegations made in this association. These are the allegations of the respective parties.

Then the referees say they are of opinion that a person acting in the discharge of any duty, legal or moral, and in good faith, is privileged in making accusations against another, without being held to prove their truth, if they are made on proper occasions, and they cite authorities in support of this proposition. Now this is a distinct legal opinion, but it is undoubtedly correct. This is admitted by the plaintiff, but he denies that this was a proper occasion. But this was a question for the referees to consider and decide. The referees then go on to say they believe that, in this commonwealth, all denominations of christians are privileged to maintain the discipline of their respective churches according to their various usages, including the making of complaints and accusations, the production and discussion of evidence, and the recording of their proceedings, and cases are cited in support of this opinion also. Now this is undoubtedly true, but the allegation on the other side is, that it is merely an abstract proposition, which does not apply to the case. To this we say as before, the question of its applicability was to a great extent one for the referees alone to settle, and how far they acted upon it, is a question of fact upon which we have no information. But it was urged by the counsel for the plaintiff that the rights of churches were not at all in question here, and it was contended in an able argument that if churches had such authority, that would not tend to show that an association of ministers had it.

It is probably true that congregational churches are independent of each other, but still there may be a common jurisdiction to which they voluntarily submit. The question here is, how far have voluntary associations, like the one in question, authority to proceed, as by consent, in the trial of charges against their own members. This depends, of course, on the nature of the association, and the rights and duties resulting from the connection of its members with it. In the case of a church, it depends upon the terms of their fundamental agreement. Certain rights doubtless belong to churches, by usage, but these rights may be varied by agreement or covenant, as it is generally termed, and churches generally have covenants as the fundamental laws of their organization.

· Now, therefore, when the referees say that all denominations of Christians are privileged to maintain their discipline according to their respective usages, it is said by the plaintiff's counsel that this may be true, but the referees are mistaken in applying the rule to this case; they have made the mistake of considering this association as a church. But they may have put it only by way of analogy, and there are analogies between the rights and usages of these two classes of societies. Thus, it is the practice with churches to recommend by vote their retiring members to other churches, in certain cases. Though this society is not identical with a church, there may be some analogies between the two, which the referees might properly have considered. Certainly, there is here no such obvious mistake of law as will authorize the court to set aside the award, and yet this is, I believe, the strongest case presented by the argument.

The referees next say it was further urged, that as all the evidence, which could be adduced, was heard by the jury on the trial of the indictment, and considered insufficient to convict the plaintiff of the crime in question, and this was known to the defendant, he was bound, after the verdict, if not before, to consider the plaintiff innocent, and consequently, his vote and remarks at the meeting at which the case was reconsidered, were malicious, and of course actionable. But, they add, the referees are of opinion that there may be cases

in which it would be proper for a jury to acquit a person charged with crime, in which it would not necessarily follow that an association of clergymen should be so far bound by the verdict as to regard and treat the individual acquitted as an innocent and moral man; that while the verdict is entitled to great weight, and ought to be regarded as *primâ facie* evidence of innocence, yet that such an association is not bound to regard it as conclusive; that when the plaintiff asked to be restored to his standing by the rescinding of their vote, and also requested to be recommended to another association, it became proper for them to discuss the matter, and to act on it according to their convictions of truth and duty. Here the opinion is stated that the verdict of a jury is not conclusive as to the moral innocence of an accused party, though it is entitled to great respect. And this is true. If it were conclusive, the plaintiff might have stood upon it. But he made a request that the question might be reëxamined, and of course upon such request the whole inquiry was open. The verdict was between other parties, and the court and jury proceeded *alio intuitu;* the guilt of the plaintiff must have been proved to them beyond a reasonable doubt, and upon legal evidence, to warrant a conviction. We coincide with the referees that there may be circumstances which would warrant such an association in discussing the question of a party's guilt after a verdict in his favor, and if there may be such circumstances, the referees were then to judge whether the circumstances before mentioned were such. If the question was one suitable for discussion, the association were then to decide it according to their convictions of truth and duty. With a view to show that they may, in all probability, have so decided the question, the referees give in detail a considerable number of circumstances which would naturally have influenced their decision. They say it is proved that before the alleged slanderous words were uttered, it was publicly known that the plaintiff had been charged with being the father of an illegitimate child, he being at the time a married man; that money was demanded of him by the mother of the child for its support, on the ground of his being the father of the child, and that he

paid money on this demand. It is also proved that he wrote a letter to the mother of the child on the subject of this demand, and concerning his intercourse with her, of an equivocal character, and calculated to excite suspicion of his guilt. On the disclosure to the public of this charge, payment of money, and writing this letter, the plaintiff resigned his office of pastor of a church, and attempted to commit suicide.

These circumstances are detailed to show, that, though the verdict of the jury is to be considered right, yet it might not be conclusive proof of the innocence of the party to the mind of a person of common candor and discrimination. There appears in all this, no violation of any absolute rule of law, and we cannot proceed, on the face of the award, to set it aside. The referees say, in conclusion, that, as the plaintiff, under the circumstances of this case, is bound to prove malice in the defendant, they think he has not sustained his action. Here is no gross, plain, erroneous mistake of law, such as would authorize a court to interfere with the award; and, in conclusion, the award is accepted, and judgment must be entered for the defendant. *Judgment for the defendant.*

*A. B. Ely,* for the plaintiff.

*J. M. Bell,* for the defendant.