OLIN R. MOYLE, Respondent, *v.* FRED W. FRANZ et al., Appellants.
(Appeal No. 1.)

Second Department, March 6, 1944.

*Hayden C. Covington* and *Ernest P. Seelman* for appellants.

*Walter Bruchhausen, William G. Fennell* and *John H. Van Surdam* for respondent.

*Per Curiam.* Upon a prior appeal in this libel action this court affirmed an order denying a motion to dismiss the complaint under rule 106 of the Rules of Civil Practice. (*Moyle* v. *Rutherford,* 261 App. Div. 968.)

The action is predicated upon the publication by defendants in *The Watchtower,* a semi-monthly magazine, of two defamatory articles concerning the plaintiff. At the close of the case a motion to dismiss the second cause of action as against the individual defendants was granted upon the ground that they were not shown to have been connected with the publication of the article " Snares." The jury returned a verdict against all the defendants on the first cause of action for $5,000 in actual damages and $10,000 in punitive damages; and against the corporate defendants on the second cause of action for an

additional $5,000 in actual damages and an additional $10,000 in punitive damages.

The trial court charged the jury that it was the law of the case that the statements sued upon were libelous. No exception was taken to the court's charge in that respect and no request was made to have the trial court charge otherwise. Upon this appeal the appellants have restricted their arguments to the defenses which they urged upon the trial. They claim that the evidence proved the truth of the defamatory statements; that the statements were qualifiedly privileged and made without malice; and that the awards of actual and punitive damages were excessive.

In considering the merits of the appellants' arguments, we have been guided by their express disclaimer of any desire to obtain a new trial by reason of any errors that may have been committed by the trial court. In part the disclaimer reads: "If defendants have not disproved these charges and established their defenses as a matter of law, they do not desire a new trial."

We are unable to agree with either alternative of the appellants' various contentions that each of their defenses is sustained by the "undisputed evidence or overwhelming preponderance of evidence." As to damages, we find that there was sufficient proof from which malice could be inferred and upon which an award of punitive damages could be based.

In the dissenting opinion dismissal of the complaint is recommended upon the ground that the statements were absolutely privileged and that the jury, in effect, decided upon the propriety of the language used by a religious society in characterizing what it considered misconduct by one of its members. We do not intend to detract from the right of a duly constituted religious or ecclesiastical tribunal to deal with matters subject to its jurisdiction, nor from its privilege to publish the results of its proceedings in an official organ. The jury in this case was instructed that a religious organization had the privilege of publishing such matters in its official magazine. The privilege is, however, not absolute but qualified. The jury was so instructed. Neither upon the trial nor before this court have the appellants contended that their publications were absolutely privileged. In their requests for special findings and in their requests to charge they specifically described their defense as one of qualified privilege. The qualified privilege of a religious society to publish matters of interest to its members may be destroyed by showing excessive publication or other evidence

of malice. (*Pecue* v. *West,* 233 N. Y. 316, 321–322; 33 Am. Jur., Libel and Slander, § 188, p. 179; 17 R. C. L., Libel and Slander, § 90, p. 344; and see *Murray* v. *Brancato,* 290 N. Y. 52, 58.) Evidence was adduced from which the jury could have found that there was excessive publication. It was testified that *The Watchtower* was distributed to all persons willing to pay its subscription price and not merely to persons interested in the affairs of the appellants' organization. The jury could, therefore, have inferred that *The Watchtower* was a magazine of general circulation rather than one restricted to persons having a mutual interest in the statements published. The jury was also entitled to infer malice from the tenor of the articles, from the fact that several defamatory statements had been published, and from the evidence that without knowledge, or with only fragmentary knowledge of the incidents to which their signed statement related, most of the individual defendants had acquiesced in defamation of the plaintiff. It is, therefore, impossible to hold as a matter of law that the defendants acted in good faith and without malice. Nor do we find these propositions established by the " undisputed evidence or overwhelming preponderance of evidence."

The jury's verdict, however, was grossly excessive, and should be reduced to $7,500 on each cause of action.

The judgment should be reversed on the facts and a new trial granted, with costs to abide the event, unless within ten days from the entry of the order hereon the plaintiff stipulate to reduce the amount of the verdict on the first cause of action from $15,000 to $7,500, and the amount of the verdict on the second cause of action from $15,000 to $7,500, in which event the judgment as so reduced is affirmed, without costs. The order denying defendants' motion for a directed verdict should be affirmed, without costs.

CARSWELL, J. (dissenting). This litigation had its genesis in a letter written by Moyle, the plaintiff, to Rutherford, the head of a religious society. It was followed by disciplinary action or expulsion of the plaintiff from the Society. The letter and rejoinders thereto were published and this action for libel eventuated. Plaintiff has recovered heavy compensatory and punitive damages. Defendants appeal from the judgment therefor.

The contentions of the defendants are clothed in legal terminology commingled with a distinctive type of religious vernacular. They do not stress a principle that should be

determinative of this litigation. It is that all matters arising out of ecclesiastical relations or the administration of the affairs of a spiritual or religious group are to be determined solely by the governing authority in the religious group. To insure unimpaired the integrity of this principle, courts will not inquire into or concern themselves, directly or indirectly, with conflicting contentions relating to the practice or to the administration of the doctrinal affairs of religious groups, or the merits of or grounds for the imposition of discipline for claimed violations of duties owing to a religious group by a member thereof. This principle was enforced against a minister in *Connitt* v. *R. P. D. C. of N. Prospect* (54 N. Y. 551); against a priest in *Baxter* v. *McDonnell* (155 N. Y. 83); against a nun in *Noonan* v. *Gibbons* (253 App. Div. 837); and in support of a rabbinical adjudication in *S. S. & B. L. P. Corp.* v. *Kashruth Assn. of G. N. Y., Inc.* (158 Misc. 358). To be sure, courts will enforce civil rights possessed by those in ecclesiastical relationships, but they are not astute to perceive such rights when they are claimed to emerge from conflicts between a member of a spiritual or religious group and its governing authority in respect of practices, doctrine or dogma, or conduct claimed to be in violation thereof. This course recognizes the impropriety of courts by their action impinging upon religious doctrine, or administration relating thereto, or disputes germinating therefrom. Any other course would be productive of public mischief and bring obloquy to all religion by the parading of criminations and recriminations which should be disposed of *in camera* by duly constituted officials.

The applicability of this principle became manifest on the first day of the trial when plaintiff put in evidence a publication of defendants of September 1, 1939, of which no mention is made in his complaint. It revealed that plaintiff had been actually ousted (not merely recommended for ouster) from the Society upon a final adjudication of " unfaithfulness." The subject matter of the publications of which plaintiff complains was unfaithfulness. One merely gave some of the details of the basis of the disciplinary action.

The defendants might well have directed the court's attention to the significance of this September 1, 1939, exhibit, and the court might have *sua sponte,* or on request, exercised its inherent power to control the order of proof and limit the evidence to this primary and controlling factor. This would have obviated, as irrelevant, the adducing of evidence during many days of the trial as to the truth or untruth of plaintiff's letter and

defendants' publications, and avoided the public mischief attendant upon such a spectacle. The course pursued resulted in a jury, in effect, passing judgment upon unfamiliar religious doctrine, religious administration, and discipline relating thereto. The jury, in effect, determined the propriety of the conduct of the affairs, spiritual and internal, of a religious society and the right of a religious society to use Scriptural terms to characterize misconduct relating to its religious practices, doctrine or administration, which, in the judgment of its duly constituted authorities, merited discipline.

Defendants are entitled to the full benefit of this pertinent principle even though some of their ideas meet with disfavor and their conduct toward some members of the community is irritating and exasperating. We are not concerned with this latter phase so long as they merely exercise fundamental rights under the law and keep their conduct within prescribed legal limits. The benefit of this principle should not be denied to them because they are inept in invoking it or because they function in a manner different from other conventionally organized or orthodox groups. This principle is indispensable to the independence of all religious groups.

We need only concern ourselves here with certain unchallenged facts. The individual defendants belong to and are directors of a society known as Jehovah's Witnesses. They follow a primitive form of practice and profession of Christianity under theocratic auspices. They disclaim being a sect or a cult. Each member of the Society becomes a "minister" or a "Witness." By joining it he or she voluntarily agrees to submit himself or herself to the existing government thereof. The Society divides itself into groups, each of which is referred to as a "family," with a distinctive name. Each member, or as he is called, each "Witness," foregoes pecuniary gain and dedicates all his native and acquired earthly skills to the religious society as part of his all-inclusive duty to advance the "kingdom interests" as a "Witness" or a "minister." One of these groups located in Brooklyn is known as the Bethel Family.

Plaintiff as a Jehovah's Witness, an ordained minister, and a lawyer, became a member of the Bethel Family. He was assigned to legal work for the group. An incident relating to a certain court proceeding occurred, which, with seeming justification, subjected him to reproach. Legal work was not his exclusive field, as he at all times acted as a "minister" or a "Witness" like the others. He decided to cease to be

a member of the Bethel Family as of September 1, 1939, and on July 21, 1939, wrote a long letter to Rutherford, the head of the Society, who is since deceased. In that letter he criticized and slurred the conduct of Rutherford and other members of that family group. He had the letter delivered to Rutherford and immediately left on a vacation. On about sixteen occasions between July 21, 1939, and September 1, 1939, he distributed the letter or the substance thereof to various members of this religious society throughout the country. Meanwhile, on August 8, 1939, Rutherford called a meeting of the Board of Directors at the Bethel Family. The delay in so doing was due to certain members being on vacation. Plaintiff was invited and attended the meeting. The letter of plaintiff was read at that meeting. Plaintiff was asked to justify his animadversions. The meeting became a sort of trial of plaintiff respecting his assertions in the letter and his conduct as a " Witness " acting for other " Witnesses " in certain court proceedings. During the meeting a resolution was adopted by the Board recommending the expulsion of plaintiff. Rutherford, the head of the Society, adopted the recommendation and directed plaintiff to leave the Bethel Home at once. He did so. As the letter referred to conduct of the entire Bethel Family, it was then read to the entire group, which numbered more than two hundred, and they were informed of the disposition made in respect of plaintiff.

In a magazine called *The Watchtower,* published by a nonstock corporate defendant owned by this religious society, the defendants, on September 1, 1939, published a notice, which stated that plaintiff was no longer with the Society and that this was due to " his unfaithfulness to the kingdom interests, *and to those who serve the kingdom.*" It also stated *inter alia* that the Board of Directors by unanimous vote on August 8, 1939, had recommended that the president sever plaintiff's connection with the Society *and that this had been done.*

Up to this point the defendants' conduct was clearly within their legal rights under the doctrine above stated. It was further sanctioned by well-settled authority respecting the propriety of publication of the severance of such relations and the reasons therefor in the exercise of absolute privilege. (*Barrows* v. *Bell,* 73 Mass. 301; *Fairchild* v. *Adams,* 65 Mass. 549; *Farnsworth* v. *Storrs,* 59 Mass. 412; *Cranfill* v. *Hayden,* 22 Tex. Civ. App. 656.) If this right did not exist, an unfaithful minister or priest would be able to do untold damage to the religious group or church that ousted him. The only way mischievous

activities of such an adjudged recreant can be frustrated or neutralized is by publishing, to those to whom his disrupting or unauthorized activities are directed, the reasons for his ouster, so that they may evaluate his representations or his claimed authority to speak on behalf of or to the church or group, in the light of findings of unfaithfulness made by the duly authorized body or official.

After September 1, 1939, plaintiff appeared at various meetings in the West of members of this religious society and publicized his reasons for leaving the Bethel Family. His explanations reflected unfavorably upon the conduct thereof and after September 1, 1939, he circulated fifty or more copies of his July 21, 1939, letter to members of various congregations of the defendant religious society who requested it, and to about eighteen who apparently made no request therefor. This conduct evidently precipitated a meeting of the defendants on September 21, 1939, at which an article prepared by Rutherford was read and signed by the individual defendants. It was entitled '' Information '' and it was later, on October 15, 1939, published in the defendants' magazine called *The Watchtower*. This article restates *part* of what had been done on August 8, 1939, in reference to the plaintiff's July 21, 1939, communication and also refers to plaintiff's conduct in circulating that letter (which was referred to as a libel), and asserts that plaintiff, who had been entrusted with confidential matters of the Society, '' assaults and maligns those who trusted him '' (having reference to his July 21, 1939, letter) just as Judas had proved his unfaithfulness to Christ Jesus. It makes no mention of plaintiff as a lawyer. This article, in substance, adds nothing to the ultimate effect of the publication of September 1, 1939, of which plaintiff did not complain, because that article stated that plaintiff had been ousted by reason of '' unfaithfulness to the kingdom interests, *and to those who serve the kingdom*,'' meaning the Society and the '' Witnesses.''

When plaintiff became a member of this religious Society he voluntarily obligated himself to submit to and abide by the government thereof, and to devote all his talents, native and acquired, not only as a '' Witness '' or ordained minister but also his incidental or acquired skill as a lawyer, to the faithful service and welfare of the Society and his associate '' Witnesses.'' When the authorized body of the Society, exercising unquestioned jurisdiction, found him guilty of unfaithfulness, it made an adjudication upon him as an ordained minister or

as a "Witness," and included as a part thereof was an adjudication of unfaithfulness to his obligations and duties as a lawyer to his associate "Witnesses," that is to "those who serve the kingdom." The September 1, 1939, publication and findings based on the August 8, 1939, meeting referred to in the October 15, 1939, publication, were that plaintiff was ousted because of "his unfaithfulness to the kingdom interests [that is, the Society of which he was a member], and to those who serve the kingdom," that is, as a "Witness" and lawyer to his associate "Witnesses." This determination of the Society is conclusive upon the courts, since no recognized vitiating element is invoked. It was a conclusive adjudication against plaintiff in respect of the July 21, 1939, letter and the unfaithful character of his conduct generally as a "Witness."

By widespread circulation of the July 21, 1939, letter plaintiff precipitated on October 15, 1939, a republication of part of the decision of the governing body published September 1, 1939. This republication, in amplified form, in no wise added in substance to the effect of the original publication or findings of the governing body. In fact this later publication was milder than was the one of September 1, 1939. It left unsaid that he had been expelled. It merely indicated that his expulsion had been recommended. It repeated in different language that he had been "unfaithful," by the use of the term "Judas," which is merely a synonym for "unfaithfulness," or the personification of that quality. To say, in effect, that he was like Judas is merely to say in a more colorful way, or with the use of a Scriptural term, what had been said in a prosaic way, in the unchallenged September 1, 1939, decision and publication — that he had been unfaithful to the kingdom and to those who serve the kingdom. The original publication of September 1, 1939, was absolutely privileged under the authorities. The absolute privilege which permitted the first publication stems from the same reason which accords absolute privilege to the republication. That the republication of a part of the basis of the September 1, 1939, article was likewise absolutely privileged became clear when plaintiff's proof relating to the September 1, 1939, article showed that his expulsion had occurred because of the facts stated in the October 15, 1939, article. It was first made known in plaintiff's proof, on the first day of the trial, that there was this September 1, 1939, publication not mentioned in the complaint.

Plaintiff's conduct necessitated the detailed and clarified republication. He professed to be desirous of not creating

dissension in this religious Society. His pretensions in this regard are not borne out by the undisputed fact that he circulated the July 21, 1939, letter or the substance thereof, both before and after the publications of September 1 and October 15, 1939. He was seeking co-operation of a rival group which was formerly part of the defendant Society. He was, during these periods, with his July 21, 1939, letter sowing the seeds of distrust, dissension and disunion among other groups in the defendant Society. To explain or neutralize his activities, defendants were entitled, under the cases cited (*supra*), to have recourse to a clarified publication of the official basis of the decision resulting in plaintiff's ouster.

This analysis of the pertinent undisputed activities of these individuals may make unnecessary a decision as to whether or not, apart from absolute privilege, there was an actionable libel in the article of October 15, 1939. The fact that no libel was seasonably asserted by suit in respect of the article of September 1, 1939, supports the view that the publication of October 15, 1939, was not a libel since it is a mere amplification of a phase or basis of the earlier publication. It is my view, without reference to the September 1, 1939, article, that the October 15, 1939, article is absolutely privileged. When considering this phase, an observation of Lord Cockburn in a kindred situation (*Koenig* v. *Ritchie*, 3 F. & F. 413) has pertinency: "I own I cannot feel much sympathy for a man, who, having been the first to make an appeal to public opinion, when he is answered in the same manner by a counter appeal, changes the tribunal which he has himself selected, and invokes the arm of the law."

Plaintiff continued his activities after October 15, 1939, in spreading his July 21, 1939, letter and Rutherford wrote and had published on November 15, 1939, in defendants' *The Watchtower* another article entitled "Snares." It is a homily, permeated with the distinctive didactic vernacular of this Society. It makes no mention of or reference to plaintiff. It might properly be read as an admonition to other "Witnesses" doing legal work. In another setting it would not attract attention. In the abstract it reproves any person who, while consecrated as a "Witness," acts as a lawyer for another "Witness" in a fashion which indicates "unfaithfulness to the kingdom." It merely declares the propriety of a finding of unfaithfulness against any person who, as a "Witness," is unfaithful in his incidental conduct as a lawyer while functioning as a "Witness" on behalf of another con-

secrated person or "Witness." There is no case which authorizes a court or a jury or a nonmember of this Society to pass judgment on the propriety of a pronouncement of abstract doctrine of this Society, or any other religious group, in its official organ, which makes no mention of plaintiff. Even if the observations be heretical or unsound or in bad taste (none of which here appears) in the eyes of nonmembers, the right to publish them is absolute, and no private right of action may be founded thereon. The writing of the article may have been inspired by plaintiff's conduct, but that has no legal significance. From the earliest times, general or abstract religious and philosophical meditations and observations have been inspired by particular instances of conduct. It has never been considered a proper function of courts to police abstract theological polemics.

If the article be deemed applicable only to plaintiff because he thinks it accurately describes his conduct, it adds nothing to the publications of September 1, 1939, and October 15, 1939. Those publications concretely referred to plaintiff and involved an adjudication of his unfaithfulness to the religious Society of which he was a part. This November 15, 1939, article merely dealt in the abstract with the same type of unfaithfulness. It did so with no mention of the plaintiff, who had been the subject of a permissible publication with reference to him as a "Witness," under a decision by the Board of a religious Society and the action of its President.

We need not consider plaintiff's circulation after the November 15, 1939, publication, of over 1,500 copies of his July 21, 1939, letter, or the extent it illumines his claimed lack of desire to disrupt the Society.

The benefit of the above principles was saved by the defendants and may be accorded to them for two reasons:

(a) On their motion to dismiss at the close of the plaintiff's case, and on the motion at the close of the entire case they asserted that the articles were "privileged," without limitation by the use of the terms "absolute" or "qualified," even though the motion was not supported by the arguments given above. "In our review we are confined to the *questions* raised or argued at the trial but not to the arguments there presented. 'Nor is it material whether the case was well presented to the court below, in the arguments addressed to it. * * *.' (*Oneida Bank* v. *Ontario Bank,* 21 N. Y. 490, 504.)" (*Persky* v. *Bank of America Nat. Assn.,* 261 N. Y. 212, 218.) Here the question of "privilege" was raised and the foregoing determinative principles rest on absolute privilege. Moreover, the

defendants were entitled to the benefit of this plea of absolute privilege even without an allegation thereof in their answer. Privilege is usually a matter of defense but if it appears in the plaintiff's evidence or pleading, the defendants may have the advantage of it without setting it up in an answer. (*Tierney* v. *Ruppert,* 150 App. Div. 863, 867; *Chapman* v. *Dick,* 197 App. Div. 551, 554; 33 Am. Jur., Libel and Slander, § 251; 37 C. J., Libel and Slander, § 403.) Here the facts establishing absolute privilege first appeared in plaintiff's case when he put the September 1, 1939, publication in evidence and it then became apparent that the October 15, 1939, publication was a mere paraphrase of a phase thereof and had been the basis of a binding adjudication according to the theretofore unmentioned September 1, 1939, publication.

(b) The defendants duly excepted, but even in the absence of such exception in the interest of justice the defendants would be entitled to the benefit of the authorities relating to absolute privilege, under section 583 of the Civil Practice Act, and sections 105 and 584, the successor sections to section 1317 of the Code of Civil Procedure. Under section 583, to prevent manifest injustice an appellate court may review a prejudicial ruling that was not acquiesced in affirmatively by the defendants, or a refusal to grant a motion of such parties. In the instant case there was a failure to grant defendants' motions to dismiss the complaint or to direct a verdict. Section 583 reinforces what was said in the *Persky* case (*supra,* p. 218): " ' It was the duty of the judges to ascertain and declare the whole law upon the undisputed facts spread before them; and it is our duty now to give such a judgment as they ought to have given.' (*Oneida Bank* v. *Ontario Bank,* 21 N. Y. 490, 504), " even if the case was not " ' well presented to the court below, in the arguments addressed to it.' " This doctrine is applicable as these arguments involve the entire controversy. Their acceptance completely eliminates liability and they may be advanced on appeal even though not specifically referred to upon the trial, provided the facts, as here, upon which the question of absolute privilege rests, appear in the record. (*Oneida Bank* v. *Ontario Bank,* 21 N. Y. 490; *Cook* v. *Whipple,* 55 N. Y. 150; *Wright* v. *Wright,* 226 N. Y. 578, 579.)

These views make it unnecessary to pass upon whether the defense of qualified privilege was established as a matter of law. There is a basis for so holding, as the rejoinders by the defendants were confined in their publication to a medium that was distributed only to " Witnesses " and the like, who

were the ones to whom, directly or indirectly, plaintiff was publishing and distributing his letter of July 21, 1939.

The judgment should be reversed on the law and the facts, with costs, and the complaint dismissed on the law, with costs. The appeal from the order should be dismissed, without costs.

CLOSE, P. J., HAGARTY and LEWIS, JJ., concur in *Per Curiam* opinion; CARSWELL, J., dissents and votes to reverse the judgment on the law and the facts, with costs, to dismiss the complaint on the law, with costs, and to dismiss the appeal from the order denying defendants' motion for a directed verdict, without costs, in opinion in which JOHNSTON, J., concurs.

Judgment reversed on the facts and a new trial granted, with costs to abide the event, unless within ten days from the entry of the order hereon plaintiff stipulate to reduce the amount of the verdict on the first cause of action from $15,000 to $7,500, and the verdict on the second cause of action from $15,000 to $7,500, in which event the judgment as so reduced is affirmed, without costs.

The order denying defendants' motion for a directed verdict is affirmed, without costs.