Steinbrink, J.
(orally). This is an action in equity in which the plaintiffs seek relief, and in which the defendants, other than the Bishop, ask for counterrelief. The unfortunate controversy which has arisen here has found its way into the courts because the parties themselves could not resolve their differences.
*1006 In order to determine the legal rights of the parties to this litigation, and growing out of their unfortunate differences, it is necessary to consider questions fundamental in their nature and character. The consideration of these questions is essential in order to acquire a true conception, not only of the meaning and purposes of a government, but the rights and duties of churches of all denominations, and of those affiliated with the churches, and the relation one bears to the other. A true understanding of these fundamental principles makes easy of solution all questions arising under, by, or through our statutes, the decisions under them, and the canons of the church. Complexity finds its simple solvent and confusion its order in the light of the knowledge of right fundamentals.
The differences, disputes, or dissensions in Holy Trinity Church had their origin a little more than a year and a half ago, when at least site of the Vestrymen complained concerning the Activities of the assistant minister.
As early as January 19,1948, a regular meeting of the Vestry was held, the proceedings of which are set forth at length in Exhibit 18, and in these minutes there was stated that a resolution had been offered, which is embodied in full in the minutes, with certain recitals of the adverse criticism which had grown in volume, and concluded with a declaration “ that it is the r Feeling of the Vestry that Reverend William Howard Melish (should resign as Assistant Minister of this Church.” The minutes further recite that at the request of the Rector, a motion was made and carried that the proposed resolution Tie tabled) but before those present — and it included all of the Vestrymen, eleven, in addition to the Rector — the opinion was expressed, and the court is quoting 1‘ That certain of the outside activities of the Assistant Rector were most detrimental to the interests of Holy Trinity,” and there follows the names of all eleven Vestrymen.
Later, on March 16, 1948, another regular meeting of the Vestry was held. These minutes are in evidence as Exhibit 20, and here, there is a recital that “ Mr. Bell read a letter addressed to the members of the Parish reporting the action of the Vestry at its meeting on January 19,1948, in unanimously disapproving certain outside activities of the Assistant Rector, and further Vrequesting an expression of opinion from the Parish in this matter.” The motion was made and seconded that the letter be sent out.
#• After discussion, the Rector refused to put the motion to a 11 vote and stated that the meeting was adjourned, although no *1007 motion to that effect had been made. ¡The Rector and Assistant Rector thereupon absented themselves from the meeting, and having done so, all of the remaining Vestrymen proceeded to choose a chairman and continued the meeting]! They then, oh"*; motion which was carried, directed that the Parish secretary furnish a list of the members of the Parish to any member of the Vestry in order to facilitate the addressing of the envelopes.
On April 20, 1948, another regular meeting of the Vestry was held. This is Exhibit 19. At this meeting the minutes recorded that the clerk of the Vestry presented a report on the answers received from the Vestry’s letter, which was mailed March 30,1948. The total number of letters sent was 384 to 552 individuals. Answers received as of April 20th, the day of the meeting, were 306, or a return of 55%, and of those received, 156, or 53%, of those expressing opinions, stated that the outside activities of the Assistant Rector were detrimental to the church. Fourteen expressed no opinion. A large minority expressed a contrary opinion.
At this meeting, the Rector announced that he had received a petition signed by 206 expressing their support of the Rector’s stand. It did not appear, however, that the petition met the issues posed by the Vestry’s letter. There are annexed to these minutes certain exhibits which need not long detain us, since the exhibits are in evidence, and they add nothing to the minutes.
These matters were brought to the attention of the Bishop of ' the Diocese, and on December 8, 1948, he, under the canons, visited the Church of the Holy Trinity. His conference with the Rector and the Assistant Rector, he has already testified to. The difficulties were not solved.
Thereafter, on January 17, 1949, another meeting, a regular meeting of the Vestry, was held, the minutes of which" are in evidence as Exhibit 17, and after disposing of more or less inconsequential matters, routine matters which naturally come before the governing boards of all churches, there was a statement on dissension. The Senior Warden presented a review of the situation in the Parish as it had been developing for a considerable period of time. In the course of that statement, the Senior Warden embodied in it the observation that “ We have now come to the cross-roads. It is evident to my way of thinking that something must be done as there is serious dissension in the Parish, and it is my belief that this lack of harmony and cooperation will continue to exist under the administration of the clergy now in office.”
*1008 Further, he said, “ More than a majority of the members of the Vestry have reached the conclusion that in view of all the circumstances both Ministers should resign for the good of the Parish, and in making a suggestion to this effect they would like to discuss suitable provisions for the comfort and needs of the Rector upon his retirement. It will help so much if an amicable settlement can he reached.”
• Then there was a discussion, and after the discussion, a resolution was put to the meeting, the Rector having declined to do so, and this resolution, which appears in full in the minutes to which the court has already referred, bears repetition now:
“ Whereas, the Vestry of the Church of the Holy Trinity, Brooklyn, New York, desires a separation and dissolution of the pastoral relations of the Rector, and the parties not being in agreement respecting such separation and dissolution; and
‘ ‘ Whereas, the Vestry has offered to pay the Rector upon his retirement an amount equal to the pension which he will be entitled to receive; and
“ Whereas, the Rector has declined to resign his Parish and has seen fit not to accept the terms offered;
“ Now, Therefore, Be It Resolved, that the giving of the notice in writing and the filing of the petition required by Section 2, Canon 46 of the Church, respecting a separation and dissolution of the pastoral relations, he authorized; such separation and dissolution of the pastoral relations, if granted, to be effective on the date fixed by the Bishop and Standing Committee.
“ Be It Further Resolved, that the notice and petition shall he in such form as may be approved by a majority of the members of the Vestry.”
There was no dissent in the Vestry to this resolution.
On January 21, 1949, the petition of the Vestrymen to the Bishop for the dissolution of the pastoral relationship was presented. There is no need to quote from it in extenso. The original is in evidence as Exhibit 1.
The petition having been presented, the matter came to the Bishop’s official attention, and on February 3,1949, the"standing committee’s decision to hold a hearing on the Vestrymen’s complaíñVwas made, and they fixed February 15th for the hearing. This appears in Exhibit 6 in evidence.
I When the matter was presented to the Bishop, acting under [the canons, his was the right to pass upon the matter himself or to call in the standing committee to counsel and advise him. This latter, he did.
*1009 Under the rules and canons governing the church in the Diocese of Long Island, the standing committee is composed of four clerics — I think they are referred to as Presbyters — and four laymen. It was on their advice that the hearing of February 15th was fixed.
Prior to that, however, the standing committee, mindful of its greater obligation to try to restore peace to troubled ranks, counseled the Bishop that prior to formal reference to it of this complaint, that he, the Bishop, should make attempt to settle the differences, pursuant to canon 46. His efforts in this regard came to naught, with the result that it was necessary to hold a hearing.
The hearing was held, covering two entire days, February 15,1949, and February 16,1949, at Garden City.
At this hearing, all parties were represented. Evidence was offered, not only for and on behalf of and by the Vestrymen, but also on behalf of the Rector and the Assistant Minister, though neither one, having properly acted on the advice of counsel, testified before the standing committee.
On this hearing before the standing committee, the minutes of which cover some 120 or more pages, there was not only testimony, but there were offered in evidence quite a number of exhibits. These exhibits amplify those matters of complaint or grievance on the part of the Vestrymen which are embodied in the complaint. They are to the effect, and the court does not purpose to cover every one of them, that the Assistant Minister was in a measure neglecting his churchly duties in favor of outside political activities and was given warnings concerning the matter and was requested, that is, the Rector was requested by the Vestry to take appropriate action, but failed to do so.
There was offered in evidence an article in “ The Churchman,” which was written by the Assistant Minister as early as July, 1943, entitled, “ Religion and Anti-Soviet Propaganda.” The Assistant Minister was chairman of the Executive Committee of the Brooklyn Non-Partisan Legislative Conference, held the latter part of February, 1944, to promote legislation favorable to Soviet Russia, in association with others whose names we need not now record, since they are already in the complaint, but at least two of whom are avowed communists.
In November, 1944, he was the author of an article which appeared in the “ Daily Worker,” urging clergymen to read: “ Teheran, Our Path in War and Peace,” by Earl Browder, who was the National Secretary of the Communist Party. I shall skip over a few of these, because, as I have already observed, nothing is to be gained by detailing each item.
*1010 f In March, 1946, he sponsored, according to the exhibit, the I “ Win the Peace Conference,” which advocated sharing atomic / energy with Russia and opposed American aid to democratic European countries.
The Assistant Minister, as the standing committee found, was until just about a month ago, chairman of the National Council x of American-Soviet Friendship, which had been described by the Attorney General of the United States as one of the subversive, if not eommunistically dominated, agencies functioning in this country.
It appeared at that hearing before the standing committee that the Assistant Minister’s activities had received wide publicity, in much of which he was referred to as the Assistant Minister or Associate Rector of Holy Trinity Church, and it was alleged that his activities have been repeatedly identified in the public’s mind with the church.
Then, before the standing committee, many of these matters were again reviewed, not only through the oral testimony of witnesses, but through the exhibits there offered, some of which, if not all, have already been referred to and are contained in the records of this case.
It goes without dispute that when, on March 6,1948, one of the Vestry, acting for the Vestry, asked for the mailing list, that, under instructions of the Rector, it was refused'. The reason for refusal at that time was that there was in the course of preparation the usual Easter appeal, and that, therefore, the list at that time could not be made available. Nevertheless, at that subsequent meeting, to which reference has already been made, the clerk of the Vestry reported that the Vestry’s letter to the Parish had been mailed on March 30, 1948. The results of that inquiry were also reported to the standing committee and evidence of it submitted to the standing committee.
After the Vestry meeting of May 17, 1948, the summer intervened, and the matter was then, in the interim, discussed with the standing committee of the Diocese, and it was as a result of that discussion that the visitation by the Bishop followed. This visitation was in accordance with canon 43 of the General Canons governing the Protestant Episcopal Church, and appears in that canon which relates to “ Of Duties of Bishops.”
After the hearings were concluded before the standing committee, they made their reports. That appears in Exhibit 7 in evidence. It bears date February 24, 1949, and concludes with I j a resolution recommending that for the reasons stated in the ■ | second specification contained in the written notice given the *1011 Bishop on January 21, 1949, the standing committee “ advise and consent that tjie judgment herein be a recommendation that the pastoral relation between the Church and the Reverend John Howard Melish shall be dissolved and that his titles be relinquished by the clergyman, and that the pastoral relation between the parties shall cease and determine at a time and upon terms specified in said judgment.”
On February 24, 1949, there was a meeting of the standing committee, attended by four cleric members and the four lay members. All were present. The secretary was instructed to present to the Bishop of the Diocese the communication and resolution appended thereto.
Thereafter, the Bishop, acting within his powers granted by the General Canons of the Church, and specifically, the canons governing the Diocese of Long Island, set forth the judgment.
It was as follows: ‘ ‘ It is our judgment that the pastoral relation between the Church of the Holy Trinity, Brooklyn, and The Reverend John Howard Melish, D. D., L. L. D., shall cease and determine on the Fourth Day of April, 1949, and that the Wardens and Vestrymen of said Church shall execute and deliver to the said The Reverend John Howard Melish, D. D., L. L. D., or to us on his behalf, an agreement imposing on the Vestry of said Church an obligation to pay him annually, in quarterly installments, a sum equal to the amount which he shall receive in each year during his life from the Church Pension Fund, approved by us according to Canon 27 of the Diocese and that his title of Rector o£ said Church be relinquished by said Clergyman.” This was dated Mar.ch 2, 1949.
Immediately thereupon, the Bishop issued his proclamation which, opening with prayer, recited that his own approach to the whole case had been intentionally pastoral, and that his concern was chiefly with the welfare of the spiritual life of the church as a whole, and with that of the priests involved in the matter in particular. He then quoted from the standing committee’s report. He also quoted from the Offices of Instruction in the Book of Common Prayer, and here it might be entirely in order to refer to that Book of Common Prayer, which is in evidence as Exhibit 4, and which, at page 543, embodies the vows of a priest in the following language which is part of the ordination :
By the Bishop: “ Will you maintain and set forwards as much as lieth in you, quietness, peace, and love, among all Christian people and especially among them that are and shall be committed to your charge?”
*1012 And the answer: “ I will do so, the Lord being my helper.”
And then the Bishop propounds the following question: “ Will you reverently obey your Bishop, and other Chief Ministers • who, according to the Canons of the Church, may have the charge and government over you; following with a glad mind and will their godly admonitions and submitting yourself to their godly judgments,” and the answer by the priest taking the vow is, “ I will so do, the Lord being my helper. ’ ’
This proclamation, mild in its terms, gave effect canonically to the judgment which, in turn, was based on the recommendation of the standing committee.
r On February 26, 1949, a petition of a self-constituted com-Í mittee within the church presented to the Rector a writing subscribed by a so-called chairman and a cochairman of the committee to retain the Rector, and to which was appended a notice that a special meeting would be held on Monday evening, March 7, 1949, for the purpose of a hearing on the charges against the Vestrymen, the nine Vestrymen who, in the performance of their Xduties, had filed the complaint with the Bishop.
I speak and try to speak kindly concerning this, and with restraint. Here were reputable men serving their church, who, doing their duty as they saw fit by their G-od and by their church, were sustained by the standing committee and by the Bishop, and yet, because of what they did — whether swayed by passion or prejudice or a natural affection for their Rector — were to be summarily removed because they had done their duty.
I On March 4th, a formal protest was made to the Rector by the I then members of the Vestry who were to be called on the carpet. ' This is embodied in Exhibit 13.
On March 7th there was presented a protest, in evidence here as Exhibit 14, against what was sought to be done as against these nine Vestrymen.
It was a demand to the Rector that the statement therein contained be read at the meeting.
Nevertheless, since they intended to hold that meeting on the night of March 7, 1949, the Vestrymen, as was their right, retained counsel, in their own name and in the name of the Lchurch of which "they were Vestrymen.
The meeting was held. -I shall not comment on the good taste of that meeting, for the decision of the Bishop of this Diocese had already been rendered.
IV And then followed the purported removal of the nine Vestry-I men by those who attended this meeting.
*1013 Here I pause to observe that in this court’s opinion that meeting had no validity whatever, for it is provided in the Religious Corporations Law of this State, in subdivision 3 of section 43 (as amd. by L. 1935, ch. 140), as follows: “ Special meetings of the Protestant Episcopal parish or church heretofore or hereafter in^iporatedffaay be held on any secular day fixed by J the vestry.”
The Vestry did not fix the time for the holding of this meeting. And it begs the question to say that it would have done no good to have made a request or demand of the Vestry, since they were the very ones whom it was sought to remove.
A church is not a sto'ek corporation, and the rules applicable under'The (leñera! Corporation Law cannot be invoked here. If the demand.-CU‘.-Anq3ieRtJiadJieen.-made-of-the-Vestrv;--aiid'“if the Vestry refusedj there were other methods by which a meeting could be compelled. But I' saVYesñAcLfuRv~IBáT''this meeting 'vvas'no different from a rump convention which arises because dissidents withdraw and set up their own organization for action.
After this meeting on March 7th they then determined to hold another meeting, on March 14, 1949, to elect new Vestrymen for those who had ostensibly been ejected from office, even including Vestrymen whose regular terms had not expired nor were about to expire.
And when notice of this proposed meeting of March 14, 1949, came to the attention of the Vestrymen, they took action. It was then that this court issued its-pxeliiniuary-u-est-paining order pending hearing and determination of the application for an injunction pendente lite.
On March 30, 1949, the proposed agreement directed by the Bishop was reduced to writing. It conforms with the judgment and the proclamation of the Bishop "with reference to the Rector’s pension rights, and other matters. It is in evidence as Exhibit 15.
On April 4^1949, a certificate, under the hand and seal of the Bishop, was'delivered, which declared the dissolution of Dr. John Howard Melish’s pastorate of Holy Trinity ChurcET"From that momeiitlbn .Dr.7Mffiish_ceas.ed..to- be the-Reeter of - Trinity Church, unless it he found that everything that had gone before was for some reason illegal or invalid.
That there were disputes, serious differences, and dissensions in this church, no one can doubt. And no one, not even my old and long-time friend, Dr. Melish, regrets it more sincerely than I do.
*1014 However distasteful the duty may he to a judge, he must nevertheless face the facts and the law, and he must, in keeping with the oath which he took, perform his duty; for while Dr. Melish and his son are ministers in the church, we judges are ministers in the temple of justice. "We cannot make the law unless the question is new. We must follow the law once that law has been fixed for us by our higher tribunals.
I turn now to decisions of our courts which are germane.
In the case of Connitt v. Reformed Protestant Dutch Church of New Prospect (54 N. Y. 551, 560-561) beginning at the bottom of page 560, our highest court has made this pronouncement: “ The relation of a pastor to his congregation, and the manner in which he discharges his duties, involving the spiritual welfare of his congregation and to some extent the character of the church organization to which he is attached, are "subjects of ecclesiastical jurisdiction. Whether a man shall be ordained as a minister, whether a pastor shall be called, dismissed, suspended or deposed, and whether his pastoral relation to any particular congregation shall be continued or terminated, are ecclesiastical matters, to be disposed of, in the Reformed Church, in the ecclesiastical judicatories in an ecclesiastical way. ’ ’
There is further and even higher authority for what has just been stated. It is to be found in Watson v. Jones reported in 80 United States Reports (13 Wall.) There is no need to quote from this at length, because it has been cited with approval many times by the courts of this State. It appears at page 679.
There is, however, in that case one paragraph and observation which I desire to quote, because it expresses my own deep and sincere feeling in this matter. It appears at page 730. The court said: “ ‘ The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasion of the civil authority. ’ ’ ’
If ever we depart from this it will be a sorry day for America, for then the basic principle of the separation of church and State will be at an end.
The founders of our Republic recognized this when into our Constitution they wrote those sixteen pregnant words: “ Congress shall make no law respecting an -establishment of religion, or prohibiting the free exercise thereof (U. S. Const., 1st Amendt.) This must forever remain one of the foundation stones of our Nation. When that stone crumbles, the Nation will crumble with it.
*1015 Yet another portion of this decision in Watkins v. Jones (supra) which touched me very deeply is to be found at the very end, at page 735, which only evidences how even the highest court in our Nation felt regarding the problem it was then confronted with.
Said the court, after stating certain reasons: “ For the same reasons we have held it under advisement for a year; not uninfluenced by the hope, that since the civil commotion, which evidently lay at the foundation of the trouble, has passed away, that charity, which is so large an element in the faith of both parties, and which, by one of the apostles of that religion, is said to be the greatest of all the Christian virtues, would have brought about a reconciliation. But we have been disappointed. It is not for us to determine or apportion the moral responsibility which attaches to the parties for this result. We can only pronounce the judgment of the law as applicable to the case presented to us ”.
Still later there was an unfortunate controversy within the ranks of the Catholic Church, and that reached our own Court of Appeals.
Said the court in that case (Baxter v. McDonnell, 155 N. Y. 83) at page 101:
“ Here the plaintiff asks the civil courts to examine and pass upon questions growing out of his relations to the church and the bishop, as one of the priests of the diocese.
“In such a case, when it appears that the whole controversy had once been submitted by the parties to the ecclesiastical tribunal which the church itself has organized for that purpose, the civil courts are justified in refusing to proceed any further. The decision of the church judicatory may and should then be treated as a bar to the action and a good defense in law. ’ ’
Further (pp. 101-102): “ A priest or minister of any church by assuming that relation necessarily subjects his conduct in that capacity to the laws and customs of the ecclesiastical body from which he derives his office and in whose name he exercises his functions, and when he submits questions concerning his rights, duties and obligations as such priest or minister to the proper church judicatory, and they have been heard and decided according to the prescribed forms, such decision is binding upon' him and will be respected by the civil courts. The decisions of the courts in this country are substantially in accordance with this view ”, citing quite a number of cases.
Once more, there came before the Appellate Division of this department an ecclesiastical question, and while the language *1016 which I will quote is from the dissenting opinion it is not on the point on which Mr. Justice Carswell spoke; the dissent was on a different ground.
Said he, in the case of Moyle v. Franz (267 App. Div. 423, affd. 293 N. Y. 842) at page 427: “ To insure unimpaired the integrity of this principle, courts will not inquire into or concern themselves, directly or indirectly, with conflicting contentions relating to the practice or to the administration of the doctrinal affairs of religious groups, or the merits of or grounds for the imposition of discipline for claimed violations of duties owing to a religious group by a member thereof. ’ ’
And then he quotes in part the case of Connitt v. Reformed Protestant Dutch Church of New Prospect (supra), the case of Baxter v. McDonnell (supra), which was a case against a priest, the case of Noonan v. Gibbons (253 Appi Div. 837), which was a case against a nun, and also a case (S. S. & B. Live Poultry Corp. v. Kashruth Assn. of Greater New York, 158 Misc. 358) which was in support of a rabbinical adjudication.
This, then, is the law of this case. There is no material issue of fact in the case whatever, none that I have been able to discover.-
The records make clear what the facts are, and no one has disputed them. Meanings of words here or there, or inferences to be drawn from them, are not at all germane.
The plaintiffs had a perfect right to resort to a court of equity to restrain injury to themselves or to protect the property of the church, for this involved a civil right.
r" There must be a decree here which will confirm the judgment and decree of the Bishop.
I repeat that from April 4, 1949, Dr. Melish ceased to be the Rector of this church.
I shall make no observation, though I hold a very strong and firm opinion, concerning the annual meeting subsequently held. That will undoubtedly be disposed of in some other forum at some other time.
There will be judgment for the plaintiffs as prayed for in their complaint.
The defendants’ prayer for judgment or cross claims will be denied and dismissed; except that there will be judgment in favor of the defendant De Wolfe on his counterclaim. And since this involves a church which has a long and honorable history in this community, no costs will be granted to either party.
Let the judgment be settled on notice.