# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-IA-00159-SCT

*CATHOLIC DIOCESE OF JACKSON,*
*MISSISSIPPI, AND JOSEPH R. KOPACZ, BISHOP*
*OF THE CATHOLIC DIOCESE OF JACKSON*

*v.*

*ARIE MATTHEUS DE LANGE*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/19/2021 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| TRIAL COURT ATTORNEYS: | H. WESLEY WILLIAMS, III |
| | MARGIE CECELIA VIRDEN |
| | STEPHEN J. CARMODY |
| | R. RICHARD CIRILLI, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | R. RICHARD CIRILLI, JR. |
| | STEPHEN J. CARMODY |
| ATTORNEY FOR APPELLEE: | H. WESLEY WILLIAMS, III |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 06/16/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     This matter comes before the Court as an interlocutory appeal of the order of the

Circuit Court of the First Judicial District of Hinds County denying a motion filed by the

Catholic Diocese of Jackson, Mississippi to dismiss claims stemming from the termination

of the employment of Arie Mattheus de Lange. The Diocese argued that, pursuant to the

ecclesiastical abstention doctrine found in the First Amendment of the United States Constitution, this case must be dismissed for lack of subject-matter jurisdiction. The circuit court disagreed and determined that "the resolution of these claims will not require immersion into the faith, discipline and doctrine of the Catholic Church or the Code of Canon Law." After careful review, we conclude that the circuit court erred and that the First Amendment demands dismissal. Therefore, we reverse and render the order of the circuit court.

**FACTS AND PROCEDURAL HISTORY**

¶2. On January 1, 2011, Bishop Joseph N. Latino of the Diocese appointed de Lange finance officer. The terms of de Lange's employment were established by the Code of Canon Law of the Roman Catholic Church. Specifically, Canon 494 outlines the finance officer's duties as follows:

> §1. In every diocese, after having heard the college of consultors and the Finance council, the bishop is to appoint a Finance officer who is truly expert in Financial affairs and absolutely distinguished for honesty.

> §2. The Finance officer is to be appointed for a Five year term but can be appointed for other Five year terms at the end of this period. The finance officer is not to be removed while in this function except for a grave cause to be assessed by the bishop after he has heard the college of consultors and the Finance council.

> §3. It is for the Finance officer to administer the goods of the diocese under the authority of the bishop in accord with the budget determined by the Finance council and, from the income of the diocese, to meet expenses which the bishop or others designated by him have legitimately authorized.

> §4. At the end of the year, the Finance officer must render an account of receipts and expenditures to the Finance council.

¶3.     On February 6, 2014, Bishop Joseph R. Kopacz replaced Bishop Latino as head of the Catholic Diocese of Jackson.  On October 4, 2018, Bishop Kopacz terminated de Lange and sent him a letter that outlined specific reasons for doing so.  The letter stated that de Lange's termination was due to:

> (1) the weakened financial administrative condition of the diocese; (2) the internal problems reflected in last year's audit report and anticipated in this year's report; (3) the unexpected large deficit this fiscal year; and (4) the lack of leadership, communication and collaboration between the office of Finance and Temporal Affairs with diocesan leadership, including but not limited to the Bishop and the Diocesan Finance Council.

In addition to a termination letter, Bishop Kopacz sent a "Separation, Severance and Release Agreement" that offered de Lange $75,000 in exchange for his relenquishing all claims against the Diocese.

¶4.     De Lange responded by hand delivering a letter to Bishop Kopacz on October 9, 2018, that appealed his termination, notified Bishop Kopacz of de Lange's appointment of Reverend Bittner as his canon lawyer and requested the revocation of the termination.  If Bishop Kopacz refused to reinstate de Lange, then de Lange, alternatively, requested an increased compensation package, a statement that de Lange resigned instead of being terminated and proof that de Lange's performance in his role as finance officer was in any way unsatisfactory.

¶5.     On October 9, 2018, the Diocesan Consultors met with Bishop Kopacz to discuss de Lange's termination.  Due to issues with the 2015-16 and 2016-17 audits and failure to "make any progress in remedying those areas that have been noted by others as areas of concern for several years[,]" the Diocesan Consultors approved Bishop Kopacz's decision

3

to terminate de Lange.[1]

¶6. On October 12, 2018, de Lange's termination and the appointment of his replacement was announced to all local parishes in the diocese by a report in the Mississippi Catholic newspaper.

¶7. On October 19, 2018, Bishop Kopacz sent Reverend Bittner, de Lange's canon lawyer, additional materials regarding de Lange's response letter to his termination. Bishop Kopacz's letter included a "Summary of Reasoning" that gave four additional grounds for termination. The first additional ground involved the financial and administrative mismanagement exhibited by the discovery of a $900,000 deficit in the diocesan budget for the 2017-18 fiscal year. The second additional ground regarded a lack of organization and collaboration over the previous few years exhibited by a failure to provide comprehensive reports on the budget and statements from budget committee members regarding a discomfort as to the validity and reliability of the budget. The third additional ground involved an instance when Father Kevin Slattery, the Vicar General, "confronted Mr. de Lange about his lack of collaboration and communication that was having a negative impact on the proper exercise of leadership among the Department Heads in the diocesan offices[,]" but noted that de Lange did very little to change his behavior. The fourth additional ground involved two instances of de Lange's mismanagement and disorganization. The first instance concerned the way in which de Lange alerted parish leadership of a significant unexpected change of

---

[1] We note that according to Section 2 of Canon 494 of the Code of Canon Law, Bishop Kopacz should have met with Diocesan Consultors before making his decision to terminate de Lange. Nonetheless, the group agreed with Bishop Kopacz's decision.

4

assessment of diocesan expenses which consequently "damaged the trust between parish and chancery leadership." The second instance involved de Lange's transferring $100,000 from Bishop William Houck's estate to "shore up the budget for the 2018-2019 fiscal year" without permission from Bishop Kopacz.

¶8. On November 5, 2018, Reverend Bittner, on behalf of de Lange, submitted a Recourse, or an appeal under the Code of Canon Law, to the Congregation for the Clergy in Vatican City. The Recourse addressed each of the four additional grounds for termination given to Reverend Bittner in the October 19, 2018 letter. The Recourse claimed the reasons for termination were not "grave causes" as required by the Code of Canon Law and were defamatory. Additionally, the Recourse stated that de Lange "believes that the Bishop's motives in terminating him, when he did, were a result of Mr. de Lange voting against the 2018-19 budget of Catholic Charities, Inc., which is run by Bishop Kopacz." Reverend Bittner set forth the difficult history between de Lange, as a member of the board of directors for the Catholic Charities, Inc., and Bishop Kopacz, as the interim director. De Lange voted against the proposal to have Bishop Kopacz serve as the interim director of the Catholic Charities, Inc., when he assumed the position in March 2016. Additionally, the day before de Lange was terminated, he voted against the budget of the Catholic Charities, Inc. De Lange, in the Recourse, claimed to have explained to the board members that Catholic Charities, Inc., had outstanding loans with the Diocese, totaling more than $790,000, and that the proposed budget could not be sustained because they were "'burning' cash through financial cash sweeps daily from the Diocese to support its own budget."

5

¶9.     On December 13, 2019, Bishop Kopacz entered a decree to rescind de Lange's termination based on the advice of the Congregation for the Clergy. De Lange was placed on administrative leave without pay until the Bishop could consult with the "finance council and the college of consultors" in accordance with the Code of Canon Law and reach a final decision on his employment. The Bishop informed de Lange that de Lange would be considered to have been in continuous employment without any interruption from the previous termination.

¶10.    On May 20, 2019, Bishop Kopacz sent de Lange a letter ending his employment with the Diocese, and on October 2, 2019, de Lange filed this action in the Circuit Court of the First Judicial District of Hinds County. In his complaint, de Lange claimed wrongful termination, defamation and negligent and intentional infliction of emotional distress. Additionally, de Lange stated in his complaint that "[a]fter applying Mississippi's choice of law rule, Section 494 of the Code of Canon Law should be applied to all issues concerning de Lange's employment with the Diocese." He further claimed that he had an implied employment contract with the Diocese, during which he "was not an employee at will under Section 494 of the Code of Canon Law as he could only be discharged for a grave reason."[2]

¶11.    The Diocese and Bishop Kopacz filed a motion to dismiss for lack of subject-matter jurisdiction under article III, section 18, of the Mississippi Constitution and the First

---

[2] After extensive research, this Court was unable to find a definition for "grave cause" as provided in the Code of Canon Law. Additionally, de Lange used the term "grave reason" interchangeably with "grave cause." Neither caselaw nor the record provided any definition for either of these terms. Furthermore, de Lange's canon lawyer conceded as much when he wrote that "[t]he law does not set out 'grave reasons' for removal[]" in de Lange's Recourse.

6

Amendment to the United States Constitution. The Diocese and Bishop Kopacz also filed a memorandum in support of their motion to dismiss, arguing that due to the separation of church and state, the circuit court is precluded from deciding an employment action that "involves the ecclesiastical matters that pertain to The Code of Canon Law of the Catholic Church."

¶12. On July 17, 2020, de Lange requested leave to amend his complaint. The circuit court held a hearing on the motion and granted de Lange's request to amend his complaint. At the hearing, the Diocese stipulated that de Lange was not an at-will employee. On July 20, 2020, de Lange filed the amended complaint in which he removed most of the references to the Code of Canon Law.[3] Instead, de Lange argued that Bishop Kopacz breached an implied five-year contract for employment based on false, pretextual and wrongful reasons. Additionally, he no longer asked the circuit court to apply the Code of Canon Law of the Catholic Church.

¶13. On August 19, 2020, the Diocese filed a renewed motion to dismiss for lack of subject-matter jurisdiction under the same reasoning as the initial motion. The motion to dismiss was denied. The Diocese notified the circuit court of its intent to request an interlocutory appeal, and the circuit court granted a stay due to uncertainty on the issue of jurisdiction.[4] This Court granted interlocutory appeal on April 16, 2021.

---

[3] De Lange also filed a second amended complaint that corrected typographical errors but otherwise was virtually the same as the first amended complaint.

[4] In granting the stay to allow the Diocese to request an interlocutory appeal, the circuit court stated that:

I. Whether the ecclesiastical abstention doctrine under the First Amendment deprived the circuit court of subject-matter jurisdiction.

II. Whether the circuit court erred by finding it had subject-matter jurisdiction pursuant to *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213 (Miss. 2005).

## STANDARD OF REVIEW

¶14. "Subject matter jurisdiction is a threshold inquiry which must be determined before a court may proceed to the merits." *Schmidt v. Cath. Diocese of Biloxi*, 18 So. 3d 814, 821 (Miss. 2009) (citing *Luckett v. Miss. Wood, Inc.*, 481 So. 2d 288, 290 (Miss. 1985)). Further, this case involves the circuit court's denial of a motion to dismiss, but just like when we grant such a motion, that decision whether to dismiss "for lack of subject matter jurisdiction is reviewed de novo." *Id.* (citing *Robinson v. TCI/US W. Commc'ns*, 117 F.3d 900, 904 (5th Cir. 1997)).

## DISCUSSION

**I. Whether the ecclesiastical abstention doctrine under the First Amendment deprived the circuit court of subject-matter jurisdiction.**

¶15. The Diocese argues that the circuit court lacks subject-matter jurisdiction pursuant to the ecclesiastical abstention doctrine under the First Amendment of the United States

---

I like second opinions. Normally, I would say no to the stay if I was absolutely sure that I was correct, but I'm not in this instance. I'm going to go ahead and stay. Go ahead and move forward with your interlocutory appeal. I'm eager to see what The Court's [sic] have [sic] to say.

8

Constitution.[5]  De Lange responds that this dispute is purely secular and is not precluded by the First Amendment.  For the reasons stated below, we conclude that the circuit court erred by finding it jurisdiction.

### *A.      Ecclesiastical Abstention Doctrine*

¶16.    This case involves the applicability of the ecclesiastical abstention doctrine. The First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.    Interpreting the First Amendment, the United States Supreme Court then recognized the ecclesiastical abstention doctrine in ***Watson v. Jones***, 80 U.S. 679, 20 L. Ed. 666 (1872).  *See **Roman Cath. Diocese of Jackson v. Morrison***, 905 So. 2d 1213, 1235-36 (Miss. 2005) (noting that ***Watson*** is the origin of the ecclesiastical abstention doctrine).  The Supreme Court later held that the Fourteenth Amendment of the United States Constitution applied this principle to the states.  ***Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.***, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952); *see also **Morrison***,

---

[5] As mentioned previously, the Diocese also contends that article III, section 18, of the Mississippi Constitution deprives the circuit court of jurisdiction.  That section provides that

> No religious test as a qualification for office shall be required; and no preference shall be given by law to any religious sect or mode of worship; but the free enjoyment of all religious sentiments and the different modes of worship shall be held sacred. The rights hereby secured shall not be construed to justify acts of licentiousness injurious to morals or dangerous to the peace and safety of the state, or to exclude the Holy Bible from use in any public school of this state.

Miss. Const., art. 3, § 18.

9

905 So. 2d at 1236 (noting that "[t]his doctrine [was] later found to be a constitutional imperative in *Kedroff*[.]").  This doctrine requires that

> For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.

*Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich*, 426 U.S. 696, 709, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976).[6]

¶17.   *Watson* involved a church property dispute.  80 U.S. at 726.  That matter was first decided by the highest Presbyterian church authorities, but it was later reversed by the Kentucky Court of Appeals.  *Id.* at 727.  The Kentucky court applied an English precedent, known as Lord Eldon's rule, that required church disputes to be submitted to civil courts and then resolved "in favor of that part of the society *adhering to and maintaining the original principles upon which it was founded*."  *Id.* at 705.  Ultimately the United States Supreme Court rejected that rule and held that civil courts are "incompetent judges of matters of faith, discipline, and doctrine[.]"  *Id.* at 732.  In those cases, civil courts must decline jurisdiction. *Id.*  The Court reasoned that

> In this class of cases we think the rule of action which should govern the civil

---

[6] As one court has put it:  "*Religious doctrine* refers to ritual, liturgy of worship and tenets of the faith." *Pilgrim's Rest Baptist Church v. Pearson*, 872 N.W.2d 16, 19 (Mich. Ct. App. 2015) (emphasis added) (internal quotation marks omitted) (quoting *Maciejewski v. Breitenbeck*, 413 N.W. 2d 65, 66 (Mich. Ct. App. 1987), *overruled on other grounds by Winkler v. Marist Fathers of Detroit, Inc.*, 500 Mich. 327, 330 (2017)).  "*Polity* refers to organization and form of government of the church." *Id.*  (emphasis added).  We agree with these definitions.

10

courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that *whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and binding on them, in their application to the case before them.*

*Id.* at 727 (emphasis added).

¶18. Further, "[t]he rule announced in *Watson* is not without precedent in Mississippi." *Morrison*, 905 So. 2d at 1235. Mississippi "courts accept the highest ecclesiastical authority in each church as being the faith and practice of that church." *Sustar v. Williams*, 263 So. 2d 537, 540 (Miss. 1972); *see also* *Mt. Helm Baptist Church v. Jones*, 79 Miss. 488, 30 So. 714, 716 (1901) ("This court exercises no ecclesiastical jurisdiction. It accepts what the highest ecclesiastical authority in each church promulgates as the faith and practice of that church[.]").

¶19. Additionally, this Court acknowledges the tone that *Watson* employed to describe a case such as this:

> This case belongs to a class, *happily rare in our courts*, in which one of the parties to a controversy, essentially ecclesiastical, resorts to the judicial tribunals of the State for the maintenance of rights which the church has refused to acknowledge, or found itself unable to protect. Much as such dissensions among the members of a religious society should be *regretted*, a regret which is increased when passing from the control of the judicial and legislative bodies of the entire organization to which the society belongs, an appeal is made to the secular authority; the courts when so called on must perform their functions as in other cases.

*Watson*, 80 U.S. at 713-14 (emphasis added); *see Rector, Church Wardens & Vestrymen of Church of Holy Trinity in City of Brooklyn v. Melish*, 88 N.Y.S.2d 764, 772 (N.Y. Sup.

11

Ct. 1949) (expressing "regret[]" over "dissensions in th[e] church"); ***Dyer v. Super. Ct. of Cal.***, 271 P. 113, 114 (Cal. Ct. App. Dist. 1928) (recognizing that "[d]issensions among members of a religious body are first to be deplored . . . ."). Like the United States Supreme Court and other courts, we regret the dissension before us today.

### B. De Lange's Three Claims

¶20. De Lange asserted three claims that stemmed from his termination as the finance officer for the Diocese. These claims are wrongful termination, defamation and infliction of emotional distress. For the following reasons, the circuit court lacked subject-matter jurisdiction to hear each claim.

### 1. Wrongful Termination

¶21. De Lange contends that the Diocese wrongfully terminated his employment in violation of an implied contract. This implied contract is based on language found in the Code of Canon Law which states that

> The Finance officer is to be appointed for a Five year term but can be appointed for other Five year terms at the end of this period. The finance officer is not to be removed while in this function except for a *grave cause* to be assessed by the bishop after he has heard the college of consultors and the Finance council.

(Emphasis added.) De Lange argues that the "grave cause[s]" given by the Diocese in support of his termination were false and that the veracity of those reasons is all that the circuit court would need to determine to rule in his favor. That is, de Lange asserts that such a determination would not require the circuit court to interpose itself in a church matter. The Diocese disagrees and argues that any determination by the circuit court would require a

12

constitutionally impermissible interpretation of the term "grave cause" in the Code of Canon Law.

¶22.    As noted above, the circuit court lacked jurisdiction to hear de Lange's wrongful termination claim.  This Court finds *Napolitano v. St. Joseph Catholic Church*, 308 So. 3d 274, 275 (Fla. Dist. Ct. App. 2020) persuasive.  In *Napolitano*, a former office manager of a church sued that church alleging that her termination was a violation of her employment agreement with the church.  *Id.* at 276.  The former employee alleged she had executed an employment agreement with the then-pastor of that church.  *Id.*  In response, the church argued that "the trial court lacked subject matter jurisdiction based on the church autonomy doctrine."[7]  *Id.*  The trial court agreed and dismissed the complaint.  *Id.*

¶23.    On appeal, the Florida District Court of Appeal reasoned that "the church autonomy doctrine extends beyond church property disputes[]" and "applies with equal force to church disputes over church polity and church administration."  *Id.* at 278 (internal quotation marks omitted) (quoting *Milivojevich*, 426 U.S. at 710).  The court continued by stating that "in cases involving disputes over polity and administration, the [United States Supreme] Court has taken a more categorical approach, recognizing that secular courts may not interfere with matters of internal church governance or interpret a church's written constitution or ecclesiastical law."  *Id.*

¶24.    The Florida District Court of Appeal applied these principles and analyzed that the

---

        [7] The church autonomy doctrine is synonymous with the ecclesiastical abstention doctrine.  *See **Morrison***, 905 So. 2d at 1235 (recognizing that "the Doctrine of Church Autonomy [is] sometimes referred to as the Ecclesiastical Abstention Doctrine.").

13

"heart of the dispute" between the former employee and the church involved "whether [the then-pastor] had authority under Canon Law to obligate successor administrations of St. Joseph to retain his chosen employees." *Id.* at 279. "Simply put, [the former employee] has requested that a secular court examine a hierarchical religious organization and determine who has the authority to speak and act on its behalf." *Id.* Ultimately, the Florida District Court of Appeal concluded that such a "request would require a court to impermissibly wade into ecclesiastical polity, in violation of the First Amendment." *Id.* For that reason, the court affirmed the trial court's dismissal of the complaint. *Id.* at 280.

¶25. Here, similarly, de Lange is requesting this Court "to impermissibly wade into ecclesiastical polity, in violation of the First Amendment." *Id.* at 279. Specifically, de Lange argues that his request merely asks a court to determine the truthfulness of the reasons given by the Diocese for his termination. De Lange insists that a civil court will not be required to interpret the Code of Canon Law. We disagree.

¶26. Even if the Diocese's reasons were found to be based on falsehoods, and we are making no such determination, *a* reason existed for de Lange's termination. That is, there was some reason for his termination, whether it is one of the reasons cited by the Diocese or, perhaps, it is simply the apparent incompatibility that existed between de Lange and Bishop Kopacz. Whatever that reason may be and regardless of the strength of that reason, the request that de Lange now makes before this Court would ultimately require judicial interpretation of what constitutes "grave cause" under the Code of Canon Law for the termination of employment of someone in de Lange's position. De Lange cannot escape the

14

circular aspect of this—that is, a court will always be required, according to de Lange's argument, to interpret the meaning of "grave cause." Such an interpretation is off limits for a civil court to make. *Id.* at 278 ("[T]he [United States Supreme] Court has taken a more categorical approach, recognizing that secular courts may not interfere with matters of internal church governance or interpret a church's written or constitution or ecclesiastical law."); *see also* **Morrison**, 905 So. 2d at 1228-29 ("We agree with and support the proposition that the First Amendment deprives our civil courts of jurisdiction over claims which would require 'excessive entanglement' of our courts in employment decisions of the Catholic Church." (citing **Lemon v. Kurtzman**, 403 U.S. 602, 612-13, 91 S. Ct. 2135, 29 L. Ed. 2d 745 (1971)).

¶27.   De Lange's wrongful termination claim attempts to challenge, in a civil court, a decision made by the Diocese. However,

> whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and binding on them, in their application to the case before them.

**Watson**, 80 U.S. at 727. Therefore, the Diocese's decision to terminate de Lange pursuant to its Code of Canon Law is binding on civil courts, and this Court must accept that decision. *Id.* For this reason, we conclude that the circuit court erred by denying the Diocese's motion to dismiss for lack of subject-matter jurisdiction.

### 2.   *Defamation*

¶28.   De Lange also brought a claim of defamation against the Diocese. Again, de Lange supports this defamation claim by arguing that the "grave cause[s]" for his termination given

by the Diocese were false. Just like his wrongful termination claim, however, for de Lange's defamation claim, a court would ultimately be required to determine whether "grave cause" existed for de Lange's termination. Such determination would require an impermissible interpretation by a civil court of the Diocese's Code of Canon Law. *Napolitano*, 308 So. 3d at 278; *see also Goodman v. Temple Shir Ami, Inc.*, 712 So. 2d 775, 777 (Fla. Dist. Ct. App. 1998) (affirming trial court's dismissal of a defamation claim because "it would have had to immerse itself in religious doctrines and concepts and 'determine' whether the religious disagreements were a 'valid' basis for the termination of [plaintiff's] services."). For this reason, we conclude that the circuit court lacked subject-matter jurisdiction and should have granted the Diocese's motion to dismiss.

3. *Negligent and Intentional Infliction of Emotional Distress*

¶29. De Lange's final claim involves negligent and intentional infliction of emotion distress. Specifically, de Lange asserts that his "emotional distress arose from the false reasons given by Bishop Kopacz for de Lange's termination." This claim is inextricably entangled with de Lange's previously discussed claims of wrongful termination and defamation. This claim will require the same impermissible interpretation of the Code of Canon Law. *Napolitano*, 308 So. 3d at 278. For this reason, we again conclude that the circuit court erred by denying the Diocese's motion to dismiss for lack of subject-matter jurisdiction.

**II. Whether the circuit court erred by finding it had subject-matter jurisdiction pursuant to *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213 (Miss. 2005).**

¶30. The circuit court denied the Diocese's motion to dismiss because it determined it had subject-matter jurisdiction pursuant to 905 So. 2d 1213. We conclude that the circuit court erred by making that determination.[8]

¶31. *Morrison* involved claims brought by a mother and her children against the Diocese arising from the alleged *sexual abuse of the children* by a former priest. *Id.* at 1219. This Court affirmed the circuit court's finding that it had subject-matter jurisdiction. *Id.* at 1248. In doing so, however, this Court defined the nature of the claims as being "more about the duty to protect the children than specific methods employed to supervise priests." *Id.* at 1222.

¶32. The *Morrison* Court ultimately held that

> Neither the Doctrine of Church Autonomy nor jurisdictional arguments shall serve to prevent the Morrisons from pursuing their causes of action in our civil courts. *The civil and criminal laws which protect children from abuse and allow those who are abused to be compensated for the damage they suffer, are neutral, generally applicable laws.* They have, at best, a de minimis effect on any religious organization's internal, ecclesiastical matters.

*Id.* at 1248 (emphasis added). This Court emphasized that *Morrison* involved instances of *child molestation*, not ecclesiastical matters. *Id.* This case does involve a decision regarding an ecclesiastical matter. *See Sustar*, 263 So. 2d at 540 (Mississippi "courts accept the highest ecclesiastical authority in each church as being the faith and practice of that church."). For this reason, we conclude that the circuit court erred when it determined it had subject-matter jurisdiction pursuant to *Morrison*.

---

[8] Although de Lange argued below that the circuit court could exercise jurisdiction pursuant to *Morrison*, and the circuit court agreed with that argument, de Lange makes scant mention of this case on appeal.

**CONCLUSION**

¶33.    The ecclesiastical abstention doctrine deprived the circuit court of subject-matter jurisdiction in this case.  For that reason, we conclude that the circuit court erred when it denied the Diocese's motion to dismiss for lack of subject-matter jurisdiction. Therefore, we reverse and render the decision of the circuit court.

¶34.    **REVERSED AND RENDERED.**

     **RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.**